# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH


**NO. 2-08-290-CV**

SUSAN COHEN MANDELL                                        APPELLANT

V.

HAROLD LANCE MANDELL                                        APPELLEE

-----------

FROM THE 233RD DISTRICT COURT OF TARRANT COUNTY

-----------

## OPINION

-----------

### I. INTRODUCTION

Appellant Susan Cohen Mandell challenges the property division made by the trial court in her divorce from Appellee Harold Lance Mandell. The primary issue that we address is whether the trial court erred by excluding all of Susan's evidence valuing Lance's interest in Oncology-Hematology Consultants, P.A. ("the Association"). For the reasons set forth below, we will affirm the trial court's judgment.

## II. BACKGROUND[1]

Susan and Lance, both of whom are physicians, married in 1989. During the marriage, Lance entered into an Employment Agreement with the Association. Lance also entered into a Stock Purchase Agreement with the Association. The Stock Purchase Agreement states that the Association would sell Lance 22,000 shares of common stock for $0.50 per share for a total purchase price of $11,000. Lance tendered a check to the Association for $11,000.

Pursuant to certain terms of the Stock Purchase Agreement, the Association also required Lance and Susan to sign a Shareholders Agreement. The Shareholders Agreement specifically addressed stock transfers, including voluntary transfers such as in the event of retirement or withdrawal from the Association and involuntary transfers such as in the event of divorce. In each of these situations, the Association and/or the other shareholders possesses the right to purchase the shares at $0.50 per share. In the event the "marital relationship of a Shareholder is terminated by divorce and such divorced Shareholder does not succeed to his former spouse's community interest, if

---

[1] The record from this divorce spans twenty-six volumes of the reporter's record and over seventeen hundred pages in the clerk's record. The following is an overview of the facts; it is limited to the facts relevant to the issues on appeal.

any, in his Shares," the Shareholders Agreement specifically provides that within 180 days, the former shareholder shall purchase "all but not less than all of" his stock back from his former spouse and sets the purchase price of the stock at $0.50 per share. In the event the former shareholder fails to exercise this right, the right of repurchase for the same price per share is shifted to the Association. According to Lance, the restrictions imposed by the Shareholder Agreement on the transfer of stock and the contractual repurchase rights vested in a former shareholder or in the Association are required by Texas laws providing that only a professional individual may be an owner of the professional association.[2] Neither Lance nor Susan signed the Shareholders Agreement.

Approximately three years after Lance had executed the Stock Purchase Agreement, Susan filed for divorce. During discovery, Susan served a subpoena duces tecum on Dr. Jordan, a shareholder of the Association, seeking payroll records, a list of assets, an inventory, corporate books, and additional documents.

---

[2] *See* Tex. Bus. Orgs. Code §§ 301.003, .004, .007 (Vernon Pamph. Supp. 2009) (providing that the owners of a professional association must be licensed to perform the type of service for which the association is formed).

3

Approximately three months later, the Association refunded the $11,000 that Lance had paid for the 22,000 shares of stock and thereafter wrote him a letter, stating that it had requested on numerous occasions during the three and a half years since he had signed the Stock Purchase Agreement that he provide it with a signed copy of the Shareholders Agreement. The Association's letter stated that because it had never received a signed copy of the Shareholders Agreement from Lance and Susan, it had never issued Lance a stock certificate and was therefore electing to refund the $11,000 that Lance had previously paid. As a result of these transactions, Lance held no shares in the Association.

Susan thereafter joined the Association, among others, in the divorce suit as a third-party defendant, claiming that it and others had conspired with Lance to defraud her. The third-party defendants answered and filed a motion for summary judgment, which the trial court initially denied because it found that there were genuine issues of material fact.

The third-party defendants filed a motion for reconsideration of their summary judgment motion, urging the trial court to find the following as a matter of law: (1) Lance's Stock Purchase Agreement with the Association was subject to its accompanying Shareholders Agreement, and (2) the Shareholders Agreement was valid and enforceable against Susan. The trial

4

court reconsidered the third-party defendants' motion for summary judgment and granted it, ruling that the Stock Purchase Agreement between Lance and the Association was subject to the terms of the Shareholders Agreement and that as a matter of law, the Shareholders Agreement between Lance and the Association was valid and enforceable as to Susan. Prior to trial, Susan settled her claims with the third-party defendants and entered into an agreement on the record that the Association would issue the 22,000 shares of stock to Lance in exchange for an $11,000 check from the community estate. Lance complied by writing the check, and the Association issued the stock to him.

During the trial, Lance objected when Susan's expert attempted to testify regarding the value of Lance's stock in the Association. The trial court sustained Lance's objection, stating that it had previously ruled by granting the third-parties' motion for summary judgment that pursuant to the terms of the Stock Purchase Agreement and the Shareholders Agreement, the value of the 22,000 shares of stock in the Association was $11,000 and that the parties were bound by the agreements. Outside the jury's presence, Susan made an offer of proof of her experts' testimony concerning the valuation of Lance's interest in the Association.

After a multi-day jury trial, the jury made the following determinations that are pertinent to the issues on appeal: (1) that the marriage between Susan

5

and Lance had become insupportable because of discord or conflict; (2) that the value of the real property at 5017 River Bluff Drive was $244,440; (3) that the amount of attorney's fees reasonably and necessarily incurred by Susan was $275,000; and (4) that the amount of attorney's fees reasonably and necessarily incurred by Lance was $0. Lance thereafter filed a motion for judgment notwithstanding the verdict, arguing that the uncontroverted testimony and exhibits that were admitted into evidence established that the reasonable and necessary attorney's fees he had incurred totaled $200,000.

After reviewing the value of the community property assets, the trial court's final decree of divorce divided the community property as follows:

|  | Susan | Lance |
|---|---|---|
| Residence located at 5017 River Bluff | $244,440.00 |  |
| 50% Citizen's Nat'l Bank Money Mkt Acct #[----][3] | $18,738.11 | $18,738.11 |
| 50% Wells Fargo Bank Acct #[----] | $10,365.32 | $10,365.32 |
| 50% Bank of America Savings Acct #[----] | $10,165.51 | $10,165.51 |
| 50% Wachovia Investment Acct #[----] | $316,622.56 | $316,622.56 |
| 50% Fidelity IRA #[-----] | $146,467.23 | $146,467.23 |
| 50% Fidelity Investments Acct #[----] | $60,522.09 | $60,522.09 |
| 100% Franklin Templeton Mut. Fund Acct #[----] | $126,723.20 |  |
| 2000 Lexus RX 300 | $14,625.00 |  |

_____

[3] The account numbers set forth in the decree are omitted for privacy reasons.

6

| | | |
|---|---|---|
| 100% Bank of America Money Mkt Acct #[----] | | $28,719.83 |
| 100% Fidelity Investments IRA #[----] | | $120,564.47 |
| 100% Fidelity Investments Acct #[----] | | $46,616.62 |
| 100% Franklin Templeton Acct #[----] | | $156,433.20 |
| 2004 Acura MDX | | $23,900.00 |
| 22,000 shares of the Association | | $11,000 |
| Total | $948,669.02 | $950,114.94 |

The trial court acknowledged that the jury had rendered a unanimous verdict on the issue of reasonable and necessary attorney's fees incurred by Susan and that the amount for trial was $275,000. The trial court, however, ordered that "to effect an equitable division of the estate of the parties' [sic] and as a part of the just and right division of property, . . . each party shall be responsible and liable for the payment of the balance of his or her own attorney's fees . . . ."

Following the entry of the judgment, Susan filed a request for findings of fact and conclusions of law, as well as a motion for new trial. In her motion for new trial, Susan argued that the trial court erred by refusing to allow her to present expert testimony to the jury concerning the value of the 22,000 shares of stock in the Association.

The trial court made findings of fact and conclusions of law setting forth the same property divisions as it had made in the decree and stated that it had

7

made "a determination of a just and right division of the assets and debts of the marital estate" by considering, among other things, monetary sanctions awarded to Susan against Lance; fault in the breakup of the marriage; and the finding by the court as a result of the summary judgment proceedings that the value of the 22,000 shares of stock in the Association was $11,000. The trial court also stated that in making the property division, it had taken into consideration that it had made no order for the award or payment of attorney's fees to be paid by Lance to Susan and that the division of the marital estate was disproportionate in Susan's favor.[4]

Susan filed objections to the trial court's findings of fact and conclusions of law and requested additional findings. Susan argued that the trial court erred when it purportedly used the method for a physician's withdrawal set forth in the Stock Purchase Agreement and unsigned Shareholders Agreement in determining the value of Lance's 22,000 shares of the Association because Lance was not being terminated or withdrawing at the time of the parties' divorce. Susan argued, as she had in her motion for new trial, that the jury should have been allowed to determine the fair market value of Lance's interest in the Association as an ongoing business.

---

[4] The division of the community assets, as set forth above, indicates a relatively equal division between the parties.

8

The trial court did not make additional findings. This appeal followed.

### III. THE ASSOCIATION'S STOCK

As set forth above, the Shareholders Agreement restricts who may own and purchase the Association's stock as well as the price at which the stock may be sold, $0.50 per share. In her first, second, and third issues, Susan argues that the trial court erred when it used the Shareholders Agreement to value Lance's 22,000 shares in the Association at $11,000 and then excluded all evidence that she attempted to put before the jury. Specifically, Susan argues that the Shareholders Agreement does not establish the fair market value of Lance's interest in the ongoing business of the Association.

#### A. Types of Valuation

As a general rule, the value to be accorded community property that is to be divided in a divorce proceeding is "market value." *See R.V.K. v. L.L.K.*, 103 S.W.3d 612, 618 (Tex. App.—San Antonio 2003, no pet.) (citing *Walston v. Walston*, 971 S.W.2d 687, 690 (Tex. App.—Waco 1998, pet. denied)). "Fair market value has been consistently defined as the amount that a willing buyer, who desires to buy, but is under no obligation to buy would pay to a willing seller, who desires to sell, but is under no obligation to sell." *Id.* (quoting *Wendlandt v. Wendlandt*, 596 S.W.2d 323, 325 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ).

9

A straight fair market value is not an appropriate valuation method, however, when a community estate owns shares in a closely held corporation and, by agreement, any sale of the shares of stock is restricted to the corporation or other stockholders. *See Beavers v. Beavers*, 675 S.W.2d 296, 299 (Tex. App.—Dallas 1984, no writ). When the sale of stock is restricted by a requirement that the shares be offered first to the corporation or to other shareholders, then essentially the fair market value of the stock is zero. *See id.*[5] In this situation, the parties may show the actual value of the property interest to the owner. *See R.V.K.*, 103 S.W.3d at 618. Such evidence might include the value of being able, by virtue of ownership of the closely held stock, to drive a new automobile, to have health insurance paid for by the company, to have a company-financed life insurance policy, to belong to a country club at company expense, and other similar financial benefits. *See* James M. Loveless & Kimberly M. Naylor, *Handling a Divorce Involving a Closely-Held Corporation*, State Bar of Texas Prof. Dev. Program, Marriage Dissolution Institute, M, M-3 (1996).

---

[5] *See also* Edwin Terry et al., *Handling the Divorce Involving a Medical Practice*, State Bar of Texas Prof. Dev. Program, Marriage Dissolution Institute, B, B-5 (1996) (explaining that "the concept of market value assumes an existing, established market" and that "as a practical matter there is often little or no actual market for a closely-held medical practice . . . . Therefore other methods of value must be used").

Generally Accepted Accounting Principles, or GAAP, "encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time." *Rowan Cos. v. Wilmington Trust Co.*, No. 14-07-00465-CV, 2009 WL 3210936, at *12 (Tex. App.—Houston [14th Dist.] 2009, Oct. 8, 2009, no pet.) (op. on reh'g) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S. Ct. 1232, 1239 (1995)). Book value is the value shown by the books of a business, which are kept in compliance with GAAP, in the absence of an agreement otherwise. *Chaffe v. Murray*, 492 S.W.2d 680, 684 (Tex. Civ. App.—Corpus Christi 1973, writ ref'd n.r.e.). Specifically, the term "book value" means the value of a corporation that is arrived at by taking the total value of the assets as shown on the books and deducting therefrom the total liabilities. *Id*. Book value has limited application, if any, in determining the value of stock in a small, closely held corporation. *See Bendalin v. Delgado*, 406 S.W.2d 897, 900–01 (Tex. 1966).

Another valuation method is the comparable sales method.[6] This method compares the property being valued with similar, recently-sold property, and values the to-be-valued property in relation to the recent sales prices for similar property. *See, e.g.*, *Religious of Sacred Heart of Tex. v. City of Houston*, 836

---

[6] *See Handling the Divorce Involving a Medical Practice*, State Bar of Texas Prof. Dev. Program, Marriage Dissolution Institute, at B-5.

S.W.2d 606, 616 (Tex. 1992); *see also* Gary L. Nickelson, *Special Problems for Divorcing Professionals and Valuation of Professional Practices*, Vol. 2 State Bar, Advanced Family Law Course, KK, 10 (1998) (recognizing that if comparable sales exist "they certainly should be considered as a measure of value").

**B.     Evidence of Valuation**

In this case, Susan's valuation evidence was presented through an offer of proof. Karl Weaver, a certified public accountant and chief financial officer for the Association, testified that he did not know what the contractual $11,000 purchase price was based on. Weaver said that the book value of the Association in 2006 was $5 million.

Bryan Charles Rice, a certified public accountant specializing in business appraisals and forensic accounting, testified that he had looked at the books for the Association, as well as Matrix Holdings and Operation Pathway Systems, L.P., which provides management services to the Association. Rice explained that 88,000 shares of common stock in the Association were outstanding and that three other doctor-shareholders in the Association each owned 22,000 shares of stock so that Lance owned a one-fourth interest in the Association.

Rice calculated the book value of the Association's equity under GAAP and concluded that under this valuation theory, Lance's one-fourth interest in

the Association was worth $794,300.  Rice determined that the fair market value of Lance's one-fourth interest in the Association, considering the Association's equity as a stand-alone business, was $1,100,100.  Rice also determined the fair market value of Lance's one-fourth interest in the Association, considering the Association's equity as a Matrix Holdings component, was $943,400.  Thus, Susan offered expert testimony via her offer of proof proposing three different methods to value the Association as an ongoing business resulting in three different figures as the value of Lance's one-fourth interest in the Association:  $794,300 (book value under GAAP); $1,100,100 (fair market value considering Association equity as a stand alone business); and $943,400 (fair market value considering Association equity as a component of Matrix).

Lance's valuation evidence in the record, which was confirmed through his cross-examination of Weaver during Susan's offer of proof, conclusively established that when three of the Association's seven physician-shareholders retired or left the practice, they were each paid $0.50 a share for their shares of stock pursuant to the Shareholders Agreement.  Each of the physician-

13

shareholders had purchased their stock for $0.50 a share years before they retired or left the practice.[7]

## C.      Division of Community Property

In a divorce proceeding, the trial court is charged with dividing the community estate in a "just and right" manner, considering the rights of both parties.  Tex. Fam. Code Ann. § 7.001 (Vernon 2006); *Boyd v. Boyd*, 131 S.W.3d 605, 610 (Tex. App.—Fort Worth 2004, no pet.).  Trial courts are afforded wide discretion in dividing marital property upon divorce; therefore, a trial court's property division may not be disturbed on appeal unless the complaining party demonstrates from evidence in the record that the division was so unjust and unfair as to constitute an abuse of discretion.  *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *Boyd*, 131 S.W.3d at 610.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).  We must indulge every reasonable presumption in favor of the trial court's proper exercise of

---

[7] Dr. Clibon and Dr. Friess sold their shares after practicing ten to twelve years with the Association.

14

discretion in dividing marital property. *Boyd*, 131 S.W.3d at 610. Accordingly, we will reverse only if the record demonstrates that the trial court clearly abused its discretion, and the error materially affected the just and right division of the community estate. *Id.*

A spouse is not entitled to a percentage of his or her spouses's future earnings. *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 640–41 (Tex. App.—Tyler 2008, no pet.). A spouse is only entitled to a division of property that the community owns at the time of divorce. *Id.* A corporation is a separate legal entity, and property owned by a corporation is neither separate nor community property of the shareholders of the corporation.[8] *See* Barbara Anne Kazen, Vol. 1 Kazen's Practical Family Law Manual, Pamph. 6, ¶ 5.21[c] (1996). Likewise, by statute, a professional association has the same powers, privileges, duties, restrictions, and liabilities as a for-profit corporation. *See* Tex. Bus. Orgs. Code § 2.108 (Vernon Pamph. Supp. 2009).[9] Although dividends from stock are

---

[8] Exceptions exist when a trial court properly disregards the corporate entity, but none of those exceptions were pleaded or proved here. *See, e.g.*, *Zisblatt v. Zisblatt*, 693 S.W.2d 944, 950 (Tex. App.—Fort Worth 1985, writ dism'd).

[9] The statutory provisions governing for-profit corporations (Texas Business Organizations Code Annotated chapters 21 and 22) apply to a professional association. *See* Tex. Bus. Orgs. Code Ann. § 302.001 (Vernon Pamph. Supp. 2009). And under chapter 21, a close corporation existing before the effective date of the Texas Business Organizations Code is a close corporation governed by the code. *See id.* § 21.707(b).

15

treated like income, a corporation's earnings or surplus funds normally do not constitute a dividend while they are retained by the corporation. *See, e.g., Legrand-Brock v. Brock*, 246 S.W.3d 318, 322 (Tex. App.—Beaumont 2008, pet. denied).

Here, the Association is by law the equivalent of a for-profit corporation. *See* Tex. Bus. Orgs. Code Ann. § 2.108. The Association's property, accounts receivable, retained earnings, and surplus funds are not assets of Susan and Lance's community estate. *See Legrand-Brock*, 246 S.W.3d at 322. Thus, they were not subject to division by the trial court. *See* Tex. Fam. Code Ann. § 7.001. The community asset in existence at the time of Lance and Susan's divorce was 22,000 shares of the Association's closely-held stock—not the Association as an ongoing business.[10] Susan nonetheless argues that the trial court abused its discretion by prohibiting her from offering expert testimony concerning the Association's value as an ongoing business and calculating Lance's interest in the Association as one-fourth of that valuation.

For the proposition that she was entitled to prove the value of Lance's one-fourth interest in the Association as an ongoing business, Susan relies upon

---

[10] Rice excluded goodwill from his valuation of Lance's interest in the Association; goodwill is not an issue in this appeal. *See* Nickelson, *Special Problems for Divorcing Professionals and Valuation of Professional Practices*, KK, at 4–9.

*Von Hohn*, 260 S.W.3d at 640–41, *Keith v. Keith*, 763 S.W.2d 950, 952 (Tex. App.—Fort Worth 1989, no writ), and *Finn v. Finn*, 658 S.W.2d 735, 740 (Tex. App.—Dallas 1983, writ ref'd n.r.e.). These cases are not applicable to the present facts for two primary reasons. First, the property being valued for purposes of divorce in those cases was not stock in a closely held corporation but a spouse's interest in an ongoing partnership. Partnership profits, by law, belong to the individual partners; the assets and profits of a professional association belong to the entity. *Compare* Tex. Bus. Orgs. Code Ann. § 152.202(c) (providing that each partner in a partnership is credited with an equal share of the partnership's profits) *with id.* § 302.011 (providing that profits of a professional association are distributed in accordance with governing documents of association). Thus, increases in the value of a partnership that accrue during a partner's marriage may be an asset of the community estate, while increases in a corporation's net worth are generally not an asset of the community estate of each of the corporation's shareholders. *Compare Von Hohn*, 260 S.W.3d at 634, 636–37 (recognizing that each partner was assigned "an undivided profits account and a capital account"; this was clearly an asset of the community) *with Legrand-Brock*, 246 S.W.3d at 322 (explaining that corporations' earning surplus funds are not a community asset). Second, the partnership agreements in *Von Hohn*, *Keith*, and *Finn*,

17

unlike the Stockholders Agreement here, did not mandate application of a particular value to the spouse's partnership interest in the event of a divorce. *Compare Von Hohn*, 260 S.W.3d at 640 (explaining that partnership agreement set value of partner's interest in event of partner's death, withdrawal, retirement, or expulsion but did not control value of individual partnership interest in event of divorce), *and Keith*, 763 S.W.2d at 953 (same), *and Finn*, 658 S.W.2d at 749 (same) (Stewart, J., concurring)[11] *with* Tex. Bus. Orgs. Code Ann. § 21.104 (Vernon Pamph. Supp. 2009) (providing that shareholders agreement is effective between shareholders and the corporation). Because the Shareholders Agreement here does contain a specific contractual provision addressing stock ownership and value in the event of a shareholder's divorce and does restrict who may own and purchase the Association's stock as well as the price at which the stock may be sold, *Von Hohn*, *Keith,* and *Finn* are not controlling. *See* Tex. Bus. Orgs. Code § 21.104. We hold that the trial court

---

[11] On the issue of valuation of the husband's partnership as an ongoing business when valuation was not controlled by the partnership agreement, the majority opinion in *Finn* simply held that the trial court erred by denying the wife full discovery of certain financial information concerning the husband's partnership. 658 S.W.2d at 746. The majority opinion in *Finn* held that this denial of discovery was reasonably calculated to and probably did result in the rendition of an improper judgment. *Id*. Here, however, Rice specifically testified that he had "all the financial information" that he needed to perform the valuations that he did. Thus, *Finn* is not applicable to the facts here.

did not abuse its discretion by excluding Susan's $794,300 one-fourth book value of the Association and her $1,100,100 and $943,400 one-fourth fair market values of the Association as an ongoing business.

Susan also contends that she is not bound by the "buy-sell" provision in the Shareholders Agreement setting the stock's value at $0.50 per share because she never signed the Shareholders Agreement and that, accordingly, the trial court abused its discretion by determining that as a matter of law Lance's 22,000 shares of the Association were valued at $11,000. It is undisputed that every shareholder of the Association paid $11,000 for their 22,000 shares of stock when the stock was issued to them and that every shareholder that left the Association was paid $11,000 for the Association to repurchase their 22,000 shares of stock. It is undisputed that Lance and Susan's community estate paid $11,000 to the Association for the issuance of Lance's 22,000 shares of stock. And finally, it is undisputed that Lance can never sell his 22,000 shares of stock for more than $11,000; the stock's value in the closely held Association is contractually set at $11,000. *See Lemaster v. Top Level Printing Ink, Inc.*, 136 S.W.3d 745, 747–48 (Tex. App.—Dallas 2004, no pet.). Nonetheless, Susan claims the stock should be valued at either $794,300 (book value under GAAP); $1,100,100 (fair market value considering Association equity as a stand alone business); or $943,400 (fair market value

19

considering Association equity as a component of Matrix). But Susan cites no authority for the proposition that a community asset (22,000 shares of the Association's stock) which is to be divided in a divorce, may have one monetary value as to one spouse ($11,000 as to Lance) and a wholly different value to the other spouse ($794,300, $1,100,100, or $943,400 as to Susan). Nor have we located any such authority. Because the evidence establishes the "comparable sales value" for Lance's 22,000 shares of the Association's stock was $11,000 based on prior sales by former physician-shareholders and because $11,000 is the only price that Lance's stock may be sold at, the trial court did not abuse its discretion by valuing the stock at $11,000 under a comparable sales valuation and as mandated by the Shareholders Agreement even though Susan did not sign it.

Susan's offer of proof likewise did not include evidence that the actual value of the stock to Lance was greater than the $11,000 "buy/sell" price by showing that by virtue of ownership of the closely held stock, he obtained benefits such as driving a new automobile, having health insurance paid for by the company, having a company-financed life insurance policy, belonging to a country club at company expense, or gaining any other similar financial benefit. *See R.V.K.*, 103 S.W.3d at 618. Because Susan's offer of proof did not include testimony or evidence that might have been relevant to establish that

20

the value of Lance's shares of stock to him was greater than the $11,000 value set by the Shareholders Agreement, the trial court did not abuse its discretion by refusing to admit the valuation evidence propounded by Susan. *Accord Fletcher v. Minn. Mining & Mfg. Co.*, 57 S.W.3d 602, 607 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (recognizing that to preserve error concerning the exclusion of evidence, the complaining party must actually offer the evidence and secure an adverse ruling from the court); *see also* Tex. R. Evid. 103(a), (b).

We overrule Susan's first, second, and third issues.

## IV. ATTORNEY'S FEES

In her fifth and sixth issues, Susan complains that the trial court erroneously granted Lance's motion for judgment notwithstanding the jury's verdict that he incurred $0 in reasonable and necessary attorney's fees, erroneously valued the parties' attorney's fees, and thereby abused its discretion in the overall division of the community estate.

Although there is no statute specifically authorizing an award of attorney's fees in a divorce proceeding, the trial court may within its sound discretion award attorney's fees. *See In re Marriage of Jackson*, 506 S.W.2d 261, 268 (Tex. Civ. App.—Amarillo 1974, writ dism'd). The fee of an attorney is but another element for the court to consider in dividing the marital estate. *Hopkins v. Hopkins*, 540 S.W.2d 783, 788 (Tex. Civ. App.—Corpus Christi

21

1976, no writ). That is, in a divorce suit, the trial court has the equitable power to award either spouse attorney's fees as a part of the just and right division of the marital estate. *See, e.g., Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981); *Carle v. Carle*, 149 Tex. 469, 474, 234 S.W.2d 1002, 1005 (1950).

> Here, the trial court's judgment expressly provides that
>
> to effect an equitable division of the estate of the parties' and as a part of the just and right division of property, and for services rendered in connection with conservatorship and support of the children, each party shall be responsible and liable for the payment of the balance of his or her own attorney's fees, expert witness fees, expenses, and costs incurred as a result of legal representation in this case.

Thus, although the trial court granted Lance's motion for judgment notwithstanding the verdict, set aside the jury's finding that Lance had incurred $0 in reasonable and necessary attorney's fees, and found that Lance had conclusively established reasonable and necessary attorney's fees in the amount of $200,000, Susan is not responsible for payment of any of Lance's attorney's fees. The judgment requires each party to pay any balance owed on their own attorney's fees. Although Susan is not required to pay Lance's attorney's fees out of her property award, she nonetheless complains that the trial court erred by granting Lance's motion for judgment notwithstanding the verdict on the jury's finding that Lance had incurred $0 in reasonable and necessary attorney's fees.

22

Assuming that the trial court did err by granting Lance's motion for judgment notwithstanding the verdict concerning his attorney's fees, Susan has not shown that any such error "probably caused the rendition of an improper judgment." *See* Tex. R. App. P. 44.1(a)(1) (providing that no judgment in a civil case may be reversed for an error of law unless the error probably caused rendition of an improper judgment). The trial court possesses broad discretion to award either spouse attorney's fees as a part of the just and right division of the marital estate; here it chose to require the parties to pay their own fees. Nothing in the record before us supports the proposition that the trial court would have ordered Lance to pay Susan's attorney's fees but for the granting of the judgment notwithstanding the verdict. In fact, a review of the list of factors set forth in the trial court's findings of fact as factors the trial court considered in making its division of the community estate—including an award of sanctions against Lance and in favor of Susan—equally supports the notion that the trial court would not have ordered Lance to pay for Susan's attorney's fees even if the trial court had not granted Lance's motion for judgment notwithstanding the verdict. Because Susan has not shown that any error by the trial court in granting Lance's motion for judgment notwithstanding the verdict, setting aside the jury's finding that Lance had incurred $0 in reasonable and necessary attorney's fees, and finding that Lance had conclusively

23

established that he had incurred reasonable and necessary attorney's fees in the amount of $200,000 probably resulted in the rendition of an improper judgment, we overrule Susan's fifth and sixth issues.

## V. CONCLUSION

We have overruled Susan's first, second, third, fifth, and sixth issues. We need not address Susan's fourth issue because it complains of the summary judgment granted to the third-party defendants; Susan settled any and all of her claims with the third-party defendants prior to trial and those defendants are not parties to this appeal.[12] Accordingly, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: March 18, 2010

---

[12] Susan expressly settled "all claims set out in the various pleadings" filed by her against the third-party defendants as well as "all claims that were asserted, that could have been asserted" by her against the third-party defendants. Susan did not file any type of motion in the trial court revoking her consent to the settlement or seeking to set it aside; she cannot now claim on appeal that the third-party defendants (against whom she now possesses no unsettled claims) should not have been granted a summary judgment. *Accord Henderson Edwards Wilson, L.L.P. v. Toledo*, 244 S.W.3d 851, 855 (Tex. App.—Dallas 2008, no pet.) (recognizing principle that party with no justiciable interest in suit has no standing to appeal ruling in suit).